# EXHIBIT 1

Page 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

S0UTHERN DIVISIONn



---------------------------------)
MICHAEL A. VANDERVORT and )
U.S. SAMPLE SERVICES INC., )
on behalf of themselves and )
others similarly situated ) Case No.:SACV
                                11-1578-JST(JPRx)
        Plaintiffs, ) Hon. Josephine
                                Staton Tucker
    vs. )

BALBOA CAPITAL )
CORPORATION,
                                )
        Defendant.
---------------------------------)

    TELEPHONIC DEPOSITION OF ANDREW BARNETT, a

non-party witness, pursuant to Subpoena, held at

Bellin & Associates, 18 East 48th Street, 8th Floor,

New York, New York 10017, on August 15, 2012,

at 10:00, before Stephen Sohmer, a court reporter and

Notary Public.

```
Page 4
 2    A N D R E W  B A R N E T T,  having been duly sworn
 3         by the Notary Public of the State of New York,
 4         assumed the stand and testified as follows:
 5    EXAMINATION
 6    BY MR. BELLIN:
 7         Q.    State your name for the record.
 8         A.    Andrew Barnett.
 9         Q.    Where do you reside?
10         A.    My business address is 20 Max
11    Avenue, Hicksville, New York 11801.
12         Q.    Good morning, Mr. Barnett. My
13    name is Aytan Bellin. I am an attorney for the
14    Plaintiff in this matter.
15              As you know, we have asked you
16    down here today for your deposition to ask you
17    a number of questions in this case. If at any
18    time you don't understand any of my questions,
19    please let me know.
20              Please don't speculate. Please
21    only answer as to your personal knowledge.
22              If you need to take a break at any
23    time, please let us know as well. I think that
24    is about it.
25              MS. BARNES: Aytan, can I just
```

Page 15

2    what else did you discuss with them?

3        A.    Nothing.

4        Q.    Did you discuss with them how they

5    were to upload their arcs to your system?

6    Withdrawn.

7        How would the persons who wanted

8    to use your fax broadcasting services get their

9    faxes to you?

10        MS. BARNES: Objection,

11    foundation.

12        Q.    If you know?

13        A.    Various methods.

14        Q.    What are the methods?

15        A.    One example would be e-mail.

16        Q.    Would they e-mail the fax to you?

17        A.    They e-mail it to PROFAX.

18        Q.    What would PROFAX do with that

19    e-mail fax?

20        A.    We would distribute it to the list

21    they provided.

22        Q.    At any time, would anyone in

23    PROFAX look at that fax?

24        MS. BARNES: Objection, vague.

25        Q.    Go ahead, you can answer.

Page 40

```
 2    was signed?
 3         A.    No.
 4         Q.    Has it only been one contract that
 5    your company has had with Balboa?
 6         A.    I don't know.  You have the
 7    paperwork.
 8         Q.    I do.  I am asking the question.
 9               What did Balboa hire PROFAX to do?
10         A.    Distribute faxes.
11         Q.    If you know, did Balboa upload
12    their faxes through the system you described?
13         A.    I don't think so.
14         Q.    So it would be fair to say they
15    would be either e-mailed or sent by disk?
16         A.    Yes.
17         Q.    That means that PROFAX looked
18    through each one of the faxes that were sent
19    out?
20         A.    Looked through is too strong.
21    Viewed, yes.
22         Q.    Viewed?
23         A.    Yes.
24               Can I answer that?
25         Q.    Sure.
```

```
                                                        Page 95
 2    on a fax they wanted sent to others, that
 3    PROFAX would do it?
 4         A.    Yes.
 5         Q.    Was that something that the
 6    clients would have to affirmatively ask PROFAX
 7    to do?
 8         A.    Yes.
 9         Q.    Do you know whether Balboa
10    affirmatively asked PROFAX to put an opt out
11    notice on their faxes from 2007 to 2011?
12         A.    No.
13               MS. BARNES:  Is the answer no, you
14         do not know?
15               THE WITNESS:  No, I do not know.
16         Q.    When a client asked PROFAX to put
17    an opt out notice on the faxes for that client,
18    where would PROFAX get the language for the opt
19    out notice?
20         A.    In house.
21         Q.    I see.
22               In other words, that wouldn't be
23    language provided by the client?
24         A.    Possibly.
25         Q.    Were there circumstances -- if
```

```
Page 96
 2     PROFAX provided the language -- placed the opt
 3     out notice on a fax for a client, was the
 4     language that it used substantially similar to
 5     the language on PL 447?
 6               MS. BARNES:  I am going to object
 7          based on ambiguity and vagueness.
 8               But you can answer.
 9     A.    I don't know.  I would have to go
10     back and review, and I have nothing to review
11     because we don't keep the documents.
12     Q.    Who created the language for the
13     opt out notices for those clients who requested
14     it?
15     A.    It was created in house.  No one
16     specific that I know of.
17     Q.    Was there a meeting that people
18     had to work on the language?
19     A.    I can't remember.
20     Q.    How long has PROFAX been providing
21     the service of putting opt out notices on
22     client faxes?
23     A.    I don't know.
24     Q.    Would it be fair to say that
25     PROFAX provided that service from 2007 to 2011?
```

Page 102

```
 2        Q.    Were you able to locate any
 3   records of transmission of facsimiles on behalf
 4   of Balboa in PROFAX's records?
 5        A.    Just invoices.
 6        Q.    Do you know what I mean when I say
 7   a transmission log?  Do you know what I mean by
 8   that term?
 9        A.    Yes, I think so.
10        Q.    Can you tell me what you
11   understand a transmission log to be?
12        A.    A transmission log would represent
13   a detailed summation or report of faxes sent or
14   failed.
15        Q.    Okay.  For example, if one of
16   these customers had uploaded a fax and listed
17   ten numbers to which it wanted that fax
18   transmitted, a transmission log would show it
19   went through to these seven particular numbers
20   and did not go through to these three numbers,
21   for example?
22        A.    Yes, correct.
23        Q.    With respect to the transmission
24   log, did you -- when you conducted your search
25   of PROFAX's records, did you locate any
```

Page 103

2  transmission logs related to facsimile

3  transmissions that were performed on behalf of

4  Balboa?

5           MR. BELLIN: Objection, asked and

6     answered.

7           You can answer.

8     A.    No.

9           MS. BARNES: I'm sorry, what was

10    your objection?

11          MR. BELLIN: Asked and answered.

12    I told him he could answer.

13    Q.    Did it surprise you when you did

14 not find any records of transmissions or

15 transmission logs for Balboa?

16    A.    No.

17    Q.    Why does it not surprise you?

18    A.    Because we don't keep them.

19    Q.    Do you have any -- in your search

20 for documents pursuant to the subpoena that was

21 issued by Plaintiff, did you find any records

22 that contained the actual facsimile messages

23 that were transmitted on behalf of Balboa?

24    A.    No.

25    Q.    Did that surprise you not to find

Page 104

2  those actual records of the messages that were
3  transmitted?
4      A.   No.
5      Q.   Why is that?
6      A.   Because we don't keep them.
7      Q.   I think you already testified that
8  PROFAX does not own the domain
9  www.removemyfaxnumber.com; correct?
10     A.   Correct.
11     Q.   Do you know if the owner of that
12 domain is affiliated in any way with PROFAX?
13     A.   No.
14     Q.   You do not know or they are not?
15     A.   I do not know.
16     Q.   Do you know if companies other
17 than PROFAX use the domain
18 www.removemyfaxnumber.com?
19     A.   No.
20          MR. BELLIN:  Meaning you don't
21     know?
22          THE WITNESS:  I don't know.
23          MS. BARNES:  Sorry.  I poorly
24     phrased that question.  Thank you.
25     Q.   Do you know if PROFAX still

2     Q.    And would that also be true if you
3 had a separate customer who wanted to send a
4 fax to that same entity, would that number be
5 blocked for that different customer?
6          MR. BELLIN: Objection, vague.
7          You can answer.
8     A.    No.
9     Q.    Do you know if the facsimiles that
10 were transmitted on behalf of Balboa by PROFAX
11 were all advertising?
12    A.    No.
13    Q.    So you don't know?
14    A.    No.
15    Q.    Did you provide Balboa with any
16 lists of facsimile numbers?
17    A.    Absolutely not.
18    Q.    Were you aware of the existence of
19 the TCPA prior being served with a subpoena in
20 this lawsuit?
21    A.    Yes.
22    Q.    Has your company taken steps to
23 comply with the TCPA?
24    A.    Yes.
25    Q.    What sort of steps or actions have

Page 110

2  you taken?
3      A.   We make sure all our clients sign
4  an agreement providing them with information
5  that they fax with the rules of the TCPA in
6  mind and that they agree not to break those
7  rules.
8      Q.   Has PROFAX, to your knowledge,
9  ever been subjected to any court judgment
10 finding that PROFAX violated the TCPA?
11     A.   No.
12          MR. BELLIN:  Nancy, I don't mean
13     to interrupt.  You are asking that
14     question in that way again.  I am not
15     trying to be difficult.  You asked if he
16     has knowledge.  I don't know which he is
17     answering.  Can you rephrase it?
18          MS. BARNES:  Sure.
19     Q.   To your knowledge, has PROFAX ever
20 been a subject of a court finding order stating
21 that PROFAX violated the TCPA?
22     A.   No.
23     Q.   To your knowledge, has PROFAX ever
24 been the subject of an FCC investigation
25 regarding TCPA compliance?

Page 111

2       A.      I don't know.
3       Q.      Okay.  Are you aware of
4   regulations that the FCC enacted regarding the
5   a TCPA?
6               MR. BELLIN:  Objection, vague.
7           Which regulations?
8               You can answer.
9       A.      Yes.
10      Q.      To your knowledge, has PROFAX
11  taken any steps to comply with regulations that
12  have been issued by the FCC with respect to the
13  TCPA faxing practices?
14              MR. BELLIN:  Same objection.
15              You can answer.
16      A.      We make our clients aware in our
17  contract between PROFAX and our client of the
18  FCC rules and ask them to sign they will not
19  break those rules.
20      Q.      I think you testified with respect
21  to Barnett Exhibit 5 about the opt out language
22  at the bottom of that facsimile.  If a client
23  uses the www.removemyfaxnumber.com website with
24  reference to faxes that are being transmitted
25  by PROFAX, is there a fee or charge for using

2    A.    Yes.

3    Q.    Do you know whether opt out
4  language that was provided by PROFAX to its
5  customers, did it change from customer to
6  customer?

7    A.    I don't know.

8    Q.    Do you know if it changed or
9  evolved over a period of time?

10    A.    Yes.

11    MR. BELLIN:  What period of time
12  are we talking about, Nancy?

13    MS. BARNES:  We'll get to that.

14    Q.    Do you have any record of opt out
15  language that was used over any period of time
16  by PROFAX with respect to the language that it
17  provided to its customers?

18    A.    No.

19    Q.    With respect to -- if you can go
20  back -- sorry to go back to the invoices.  If
21  you could back to Barnett Exhibit 1.

22    A.    Okay.

23    Q.    And specifically PL 138.

24    A.    Bear with me.

25    Okay.

Page 116

2    A.    Yes.

3    Q.    Then if you look further down on
4 the invoice, under "Delivery" on the invoice,
5 there is a subsection that says, "Total fax
6 destination per page," and the quantity is
7 "30,951." So it's two pages more than the sent
8 number.

9    Do you have an explanation as to
10 why those two numbers would be different?

11    A.    Yes.

12    Q.    What would that be?

13    A.    The system received information
14 back that two pages were not potentially
15 delivered in their entirety, so it sent those
16 two pages again.

17    Q.    Okay. Gotcha.

18    MS. BARNES: Sorry, looking
19 through my notes. I'm almost finished.
20 Those are all my questions.

21    MR. BELLIN: Thank you.

22 EXAMINATION (CONT'D)

23 BY MR. BELLIN:

24    Q.    Mr. Barnett, I believe you
25 testified that the language of the opt out

Magna Legal Services

Page 117

2  notice evolved over time. Please explain what
3  you meant by that.
4     A.   With specific FCC rule changes,
5  there may have been an evolution in the
6  language used as an opt out notice.
7     Q.   When you say "there may have
8  been," do you actually know there was an
9  evolution been?
10    A.   I recall there was, but I can't
11 recall the specifics.
12    Q.   Do you recall when the opt out
13 notice evolved?
14    A.   I believe when the FCC made rule
15 changes in 2006. I can't recall the exact
16 date.
17    Q.   Your testimony is that the opt out
18 notice, you believe, was changed in 2006?
19    A.   I believe it changed when the rule
20 change was made by the FCC. I don't know what
21 year that was.
22    Q.   When the rule changed, you are
23 talking about the one that had to do with the
24 opt out notice; correct?
25    A.   I would assume so.

Page 119

2  Q. Do you know if that is the opt out
3  language that was used by all customers who
4  chose to use language that was provided by
5  PROFAX between 2007 and 2011?
6  A. No.
7  MS. BARNES: That's all I have.
8  MR. BELLIN: I am sorry.
9  EXAMINATION (CONT'D)
10  BY MR. BELLIN:
11  Q. When you say that no, do you know
12  whether -- do you have knowledge as to
13  whether -- either way as to whether this
14  language was used by Balboa?
15  A. Can you be more specific?
16  Q. Do you have any knowledge as to
17  what language Balboa -- withdrawn.
18  Do you have any knowledge as to
19  what opt out language was on Balboa's faxes
20  sent to your company from 2007 to 2011?
21  A. Only what you gave me as Exhibit
22  5.
23  Q. Other than that, do you have
24  knowledge of any other opt out notice ever used
25  by Balboa?

```
Page 120
 2        A.     No.
 3               MR. BELLIN:  That's all.
 4               (Discussion off the record.)
 5               MR. BELLIN:  We will get the
 6      transcript to the witness, and he will
 7      have until the 4th of September to make
 8      any revisions.
 9               THE WITNESS:  I do have a question
10      on the record.  Can someone advise me in
11      terms of changes I am allowed to make or
12      not make?
13               MR. BELLIN:  You have to consult
14      with an attorney about that.
15               MS. BARNES:  You want to make it
16      clear on the record, Andrew, that you are
17      not waiving your right to review and
18      revise what has been said.
19               THE WITNESS:  That's correct.
20               MS. BARNES:  Thank you.  Have a
21      nice weekend, all.
22               (Time noted:  12:47 p.m.)
23
24
25
```

Magna Legal Services

Page 123

2       C E R T I F I C A T E

3

4   STATE OF NEW YORK         )
                              ) Ss. :
5   COUNTY OF NEW YORK        )

6

7           I, STEPHEN SOHMER, a reporter

8   and Notary Public within and for the State of

9   New York, do hereby certify:

10          That ANDREW BARNETT, the witness whose

11  deposition is hereinbefore set forth,

12  was duly sworn by me and that such deposition

13  is a true record of the testimony given by

14  such witness.

15          I further certify that I am not

16  related to any of the parties to this action

17  by blood or marriage, and that I am in no way

18  interested in the outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto

20  set my hand on this 22nd day of August, 2012.

21

22

23  _____
    STEPHEN SOHMER

24

25