# EXHIBIT 1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISIONn

COPY

------------------------------------)
MICHAEL A. VANDERVORT and
U.S. SAMPLE SERVICES INC.,                )
on behalf of themselves and
others similarly situated           ) Case No.:SACV
                                      11-1578-JST(JPRx)
              Plaintiffs,           ) Hon. Josephine
                                      Staton Tucker
       vs.                          )

BALBOA CAPITAL                      )
CORPORATION,
                                    )
              Defendant.
------------------------------------)

        TELEPHONIC DEPOSITION OF ANDREW BARNETT, a

non-party witness, pursuant to Subpoena, held at

Bellin & Associates, 18 East 48th Street, 8th Floor,

New York, New York 10017, on August 15, 2012,

at 10:00, before Stephen Sohmer, a court reporter and

Notary Public.

Page 4

2    A N D R E W    B A R N E T T,    having been duly sworn

3            by the Notary Public of the State of New York,

4            assumed the stand and testified as follows:

5    EXAMINATION

6    BY MR. BELLIN:

7        Q.    State your name for the record.

8        A.    Andrew Barnett.

9        Q.    Where do you reside?

10       A.    My business address is 20 Max

11   Avenue, Hicksville, New York 11801.

12       Q.    Good morning, Mr. Barnett.  My

13   name is Aytan Bellin.  I am an attorney for the

14   Plaintiff in this matter.

15            As you know, we have asked you

16   down here today for your deposition to ask you

17   a number of questions in this case.  If at any

18   time you don't understand any of my questions,

19   please let me know.

20            Please don't speculate.  Please

21   only answer as to your personal knowledge.

22            If you need to take a break at any

23   time, please let us know as well.  I think that

24   is about it.

25            MS. BARNES:  Aytan, can I just

Page 15

2      what else did you discuss with them?

3           A.      Nothing.

4           Q.      Did you discuss with them how they

5      were to upload their arcs to your system?

6      Withdrawn.

7                   How would the persons who wanted

8      to use your fax broadcasting services get their

9      faxes to you?

10                  MS. BARNES:   Objection,

11          foundation.

12          Q.      If you know?

13          A.      Various methods.

14          Q.      What are the methods?

15          A.      One example would be e-mail.

16          Q.      Would they e-mail the fax to you?

17          A.      They e-mail it to PROFAX.

18          Q.      What would PROFAX do with that

19     e-mail fax?

20          A.      We would distribute it to the list

21     they provided.

22          Q.      At any time, would anyone in

23     PROFAX look at that fax?

24                  MS. BARNES:   Objection, vague.

25          Q.      Go ahead, you can answer.

Page 40

2    was signed?

3         A.    No.

4         Q.    Has it only been one contract that

5    your company has had with Balboa?

6         A.    I don't know.  You have the

7    paperwork.

8         Q.    I do.  I am asking the question.

9                What did Balboa hire PROFAX to do?

10        A.    Distribute faxes.

11        Q.    If you know, did Balboa upload

12   their faxes through the system you described?

13        A.    I don't think so.

14        Q.    So it would be fair to say they

15   would be either e-mailed or sent by disk?

16        A.    Yes.

17        Q.    That means that PROFAX looked

18   through each one of the faxes that were sent

19   out?

20        A.    Looked through is too strong.

21   Viewed, yes.

22        Q.    Viewed?

23        A.    Yes.

24               Can I answer that?

25        Q.    Sure.

Page 84

2       A.      No.

3       Q.      In the ordinary course of

4   business, would that be the PROFAX

5   representative would say to the client?

6       A.      No.

7               MS. BARNES:   Object to the

8   foundation.

9       A.      I would recommend they consult the

10   rules in the agreement that they signed.

11       Q.      And they check the FCC website

12   about opt outs?

13       A.      It states that in our agreements.

14       Q.      I note that it has here a web

15   page, www.removemyfaxnumber.com.   Again, we're

16   on PL 000447.

17               Do you know what that website is?

18       A.      It's a website you can go to have

19   your fax number removed.

20       Q.      Do you run that website?   Does

21   PROFAX run that website?

22       A.      Can you be more specific?

23       Q.      Is it registered in PROFAX's name?

24       A.      No.

25       Q.      Do you provide that website --

Page 85

2   provide the name of that website or the link to

3   that website to clients to put in their opt out

4   notices?

5        A.     That's the service that we use for

6   opt outs, yes.  One of the modes we use for opt

7   out methods.

8        Q.     In other words, you would tell the

9   client, look, if you want to do opt outs, you

10  can use our www.removemyfaxnumber.com service;

11  is that correct?

12       A.     You said "our."  No.

13       Q.     Withdrawn.

14              You can use the

15  www.removemyfaxnumber.com service?

16       A.     It was one of the toll free

17  methods available, yes.

18       Q.     That's what you would tell the

19  clients; correct?

20       A.     Yes.

21       Q.     What is the significance of the

22  PIN number, PIN No. 14641?

23       A.     That's the account number we would

24  give our specific clients.

25       Q.     What would happen when a person

Page 86

2   who received a fax went on to

3   www.removemyfaxnumber.com?  What would they see

4   when they went to that website?

5        A.     They would see a screen that gave

6   them the ability to enter a fax number and a

7   PIN number and submit.

8        Q.     It would have two fields, fax

9   number, PIN number and submit?

10       A.     I can't remember specific screens,

11  but it sounds reasonable, yes.

12       Q.     What company or person runs

13  www.removemyfaxnumber.com?

14       A.     I can't remember.  I can provide

15  that later.

16       Q.     Does PROFAX pay

17  www.removemyfaxnumber.com a fee for the service

18  they provide?

19       A.     I will confirm that.  Possibly,

20  yes.

21       Q.     You can confirm it when you are

22  overlooking the deposition testimony.

23       A.     (Insert:------------------------.)

24              I notice here, it says "or

25  call" -- I'm looking again at the opt out

Page 91

2    statement, which is PL 000447, in my opinion,

3    reading that, there are two methods, a toll

4    free number and a website.

5         Q.    Were there other times that you

6    were aware of that clients put a fax number in

7    the opt out notice for people to send opt out

8    requests to?

9         A.    Yes.

10        Q.    Are you familiar with the opt out

11   notices that were placed on any of the Balboa

12   faxes from 2007 to 2011?

13        A.    The one you just showed me on

14   PL 000447.

15        Q.    Do you recognize that as an opt

16   out notice that Balboa used?

17        A.    It's on a Balboa document.  I

18   recognize on this specific document that you

19   presented to me, that there's an opt out

20   statement on that.  That's all I can clarify.

21        Q.    Was the language for that

22   statement put on the fax by the client and then

23   uploaded to PROFAX?  In other words, was this

24   opt out notice in general -- just say in

25   general, was an opt out notice already on the

Page 95

2    on a fax they wanted sent to others, that

3    PROFAX would do it?

4         A.    Yes.

5         Q.    Was that something that the

6    clients would have to affirmatively ask PROFAX

7    to do?

8         A.    Yes.

9         Q.    Do you know whether Balboa

10   affirmatively asked PROFAX to put an opt out

11   notice on their faxes from 2007 to 2011?

12        A.    No.

13             MS. BARNES:  Is the answer no, you

14        do not know?

15             THE WITNESS:  No, I do not know.

16        Q.    When a client asked PROFAX to put

17   an opt out notice on the faxes for that client,

18   where would PROFAX get the language for the opt

19   out notice?

20        A.    In house.

21        Q.    I see.

22             In other words, that wouldn't be

23   language provided by the client?

24        A.    Possibly.

25        Q.    Were there circumstances -- if

Page 96

2    PROFAX provided the language -- placed the opt

3    out notice on a fax for a client, was the

4    language that it used substantially similar to

5    the language on PL 447?

6                    MS. BARNES:  I am going to object

7           based on ambiguity and vagueness.

8                    But you can answer.

9         A.    I don't know.  I would have to go

10   back and review, and I have nothing to review

11   because we don't keep the documents.

12        Q.    Who created the language for the

13   opt out notices for those clients who requested

14   it?

15        A.    It was created in house.  No one

16   specific that I know of.

17        Q.    Was there a meeting that people

18   had to work on the language?

19        A.    I can't remember.

20        Q.    How long has PROFAX been providing

21   the service of putting opt out notices on

22   client faxes?

23        A.    I don't know.

24        Q.    Would it be fair to say that

25   PROFAX provided that service from 2007 to 2011?

2      Q.      Okay.  And typically when a client

3   receives a statement of invoices; i.e., they

4   have multiple invoices throughout the month, do

5   those clients typically pay just once a month,

6   or do they pay for each individual invoice?

7      A.      In this case, it looks like they

8   paid at the end of December.

9      Q.      Okay.  Let me just ask you a few

10  questions.  I know that prior to your

11  deposition even being noticed, that you

12  previously received a subpoena from Plaintiff

13  requesting the production of records, not you

14  personally, but PROFAX.  Do you recall that?

15     A.      Yes.

16     Q.      Were you the person at PROFAX who

17  was responsible for responding to that

18  subpoena?

19     A.      Yes.

20     Q.      In the process of signing that

21  subpoena, did you look in PROFAX's records for

22  records or documentation relating to

23  transmissions that PROFAX did on behalf of

24  Balboa?

25     A.      Yes.

Page 102

2        Q.     Were you able to locate any

3   records of transmission of facsimiles on behalf

4   of Balboa in PROFAX's records?

5        A.     Just invoices.

6        Q.     Do you know what I mean when I say

7   a transmission log?  Do you know what I mean by

8   that term?

9        A.     Yes, I think so.

10       Q.     Can you tell me what you

11  understand a transmission log to be?

12       A.     A transmission log would represent

13  a detailed summation or report of faxes sent or

14  failed.

15       Q.     Okay.  For example, if one of

16  these customers had uploaded a fax and listed

17  ten numbers to which it wanted that fax

18  transmitted, a transmission log would show it

19  went through to these seven particular numbers

20  and did not go through to these three numbers,

21  for example?

22       A.     Yes, correct.

23       Q.     With respect to the transmission

24  log, did you -- when you conducted your search

25  of PROFAX's records, did you locate any

2        transmission logs related to facsimile

3        transmissions that were performed on behalf of

4        Balboa?

5                    MR. BELLIN:  Objection, asked and

6             answered.

7                    You can answer.

8             A.      No.

9                    MS. BARNES:  I'm sorry, what was

10            your objection?

11                   MR. BELLIN:  Asked and answered.

12            I told him he could answer.

13            Q.      Did it surprise you when you did

14       not find any records of transmissions or

15       transmission logs for Balboa?

16            A.      No.

17            Q.      Why does it not surprise you?

18            A.      Because we don't keep them.

19            Q.      Do you have any -- in your search

20       for documents pursuant to the subpoena that was

21       issued by Plaintiff, did you find any records

22       that contained the actual facsimile messages

23       that were transmitted on behalf of Balboa?

24            A.      No.

25            Q.      Did that surprise you not to find

Page 104

2      those actual records of the messages that were

3      transmitted?

4            A.      No.

5            Q.      Why is that?

6            A.      Because we don't keep them.

7            Q.      I think you already testified that

8      PROFAX does not own the domain

9      www.removemyfaxnumber.com; correct?

10           A.      Correct.

11           Q.      Do you know if the owner of that

12     domain is affiliated in any way with PROFAX?

13           A.      No.

14           Q.      You do not know or they are not?

15           A.      I do not know.

16           Q.      Do you know if companies other

17     than PROFAX use the domain

18     www.removemyfaxnumber.com?

19           A.      No.

20                   MR. BELLIN:  Meaning you don't

21           know?

22                   THE WITNESS:  I don't know.

23                   MS. BARNES:  Sorry.  I poorly

24           phrased that question.  Thank you.

25           Q.      Do you know if PROFAX still

Page 107

2   and update your database; is that correct?

3         A.      That would have to be read back to

4   me to confirm that.

5         Q.      Let me rephrase.  I apologize.

6   That wasn't a well phrased question.

7               Do you know how long it takes for

8   a person or entity who runs the website that

9   you use for opt out purposes, how long it takes

10   them, once they received an opt out request,

11   how long it takes them to update their

12   database?

13         A.      It is extremely fast.

14         Q.      Do you have any reason to believe

15   it takes more than 30 days?

16         A.      Absolutely not.

17         Q.      With respect to the toll free

18   number that is listed in the opt out that we

19   heard some testimony on, do you know if that

20   toll free number is something where a person

21   who called it reaches a live operator?

22         A.      It is a recorded message, I

23   believe.

24         Q.      And do you know what information

25   is requested of somebody who called that

Page 108

2    number?

3         A.      Yes.

4         Q.      What is requested?

5         A.      Fax number and I believe a five

6    digit PIN.

7         Q.      Okay.  To your knowledge, is that

8    a number that operates 24 hours a day?

9         A.      Yes, it is.

10        Q.      Okay.  We talked about the PIN

11   number that is included in some opt out

12   notices, and I believe you testified that the

13   PIN number is associated with a particular

14   customer; is that correct?

15        A.      Yes.

16        Q.      So if you received an opt out

17   notice, for example, for Balboa from a

18   recipient who had received a Balboa fax, and

19   they put in the PIN number associated with

20   Balboa, I think you testified in the future any

21   faxes that Balboa would intend to transmit

22   using your system would be blocked because they

23   were going to a number that has previously

24   opted out; is that correct?

25        A.      Yes.

Page 109

2      Q.      And would that also be true if you

3  had a separate customer who wanted to send a

4  fax to that same entity, would that number be

5  blocked for that different customer?

6              MR. BELLIN:  Objection, vague.

7              You can answer.

8      A.      No.

9      Q.      Do you know if the facsimiles that

10  were transmitted on behalf of Balboa by PROFAX

11  were all advertising?

12     A.      No.

13     Q.      So you don't know?

14     A.      No.

15     Q.      Did you provide Balboa with any

16  lists of facsimile numbers?

17     A.      Absolutely not.

18     Q.      Were you aware of the existence of

19  the TCPA prior being served with a subpoena in

20  this lawsuit?

21     A.      Yes.

22     Q.      Has your company taken steps to

23  comply with the TCPA?

24     A.      Yes.

25     Q.      What sort of steps or actions have

Page 110

2      you taken?

3          A.     We make sure all our clients sign

4      an agreement providing them with information

5      that they fax with the rules of the TCPA in

6      mind and that they agree not to break those

7      rules.

8          Q.     Has PROFAX, to your knowledge,

9      ever been subjected to any court judgment

10     finding that PROFAX violated the TCPA?

11         A.     No.

12                MR. BELLIN:  Nancy, I don't mean

13            to interrupt.  You are asking that

14            question in that way again.  I am not

15            trying to be difficult.  You asked if he

16            has knowledge.  I don't know which he is

17            answering.  Can you rephrase it?

18                MS. BARNES:  Sure.

19         Q.     To your knowledge, has PROFAX ever

20     been a subject of a court finding order stating

21     that PROFAX violated the TCPA?

22         A.     No.

23         Q.     To your knowledge, has PROFAX ever

24     been the subject of an FCC investigation

25     regarding TCPA compliance?

Page 111

2          A.      I don't know.

3          Q.      Okay.  Are you aware of

4     regulations that the FCC enacted regarding the

5     a TCPA?

6                  MR. BELLIN:  Objection, vague.

7          Which regulations?

8                  You can answer.

9          A.      Yes.

10         Q.      To your knowledge, has PROFAX

11    taken any steps to comply with regulations that

12    have been issued by the FCC with respect to the

13    TCPA faxing practices?

14                 MR. BELLIN:  Same objection.

15                 You can answer.

16         A.      We make our clients aware in our

17    contract between PROFAX and our client of the

18    FCC rules and ask them to sign they will not

19    break those rules.

20         Q.      I think you testified with respect

21    to Barnett Exhibit 5 about the opt out language

22    at the bottom of that facsimile.  If a client

23    uses the www.removemyfaxnumber.com website with

24    reference to faxes that are being transmitted

25    by PROFAX, is there a fee or charge for using

Page 113

2        A.      Yes.

3        Q.      Do you know whether opt out

4   language that was provided by PROFAX to its

5   customers, did it change from customer to

6   customer?

7        A.      I don't know.

8        Q.      Do you know if it changed or

9   evolved over a period of time?

10       A.      Yes.

11               MR. BELLIN:  What period of time

12          are we talking about, Nancy?

13               MS. BARNES:  We'll get to that.

14       Q.      Do you have any record of opt out

15   language that was used over any period of time

16   by PROFAX with respect to the language that it

17   provided to its customers?

18       A.      No.

19       Q.      With respect to -- if you can go

20   back -- sorry to go back to the invoices.   If

21   you could back to Barnett Exhibit 1.

22       A.      Okay.

23       Q.      And specifically PL 138.

24       A.      Bear with me.

25               Okay.

Page 116

2      A.    Yes.

3      Q.    Then if you look further down on

4  the invoice, under "Delivery" on the invoice,

5  there is a subsection that says, "Total fax

6  destination per page," and the quantity is

7  "30,951." So it's two pages more than the sent

8  number.

9          Do you have an explanation as to

10  why those two numbers would be different?

11     A.    Yes.

12     Q.    What would that be?

13     A.    The system received information

14  back that two pages were not potentially

15  delivered in their entirety, so it sent those

16  two pages again.

17     Q.    Okay. Gotcha.

18        MS. BARNES: Sorry, looking

19     through my notes. I'm almost finished.

20        Those are all my questions.

21        MR. BELLIN: Thank you.

22  EXAMINATION (CONT'D)

23  BY MR. BELLIN:

24     Q.    Mr. Barnett, I believe you

25  testified that the language of the opt out

Page 117

2    notice evolved over time.  Please explain what

3    you meant by that.

4        A.     With specific FCC rule changes,

5    there may have been an evolution in the

6    language used as an opt out notice.

7        Q.     When you say "there may have

8    been," do you actually know there was an

9    evolution been?

10        A.     I recall there was, but I can't

11    recall the specifics.

12        Q.     Do you recall when the opt out

13    notice evolved?

14        A.     I believe when the FCC made rule

15    changes in 2006.  I can't recall the exact

16    date.

17        Q.     Your testimony is that the opt out

18    notice, you believe, was changed in 2006?

19        A.     I believe it changed when the rule

20    change was made by the FCC.  I don't know what

21    year that was.

22        Q.     When the rule changed, you are

23    talking about the one that had to do with the

24    opt out notice; correct?

25        A.     I would assume so.

Page 119

2          Q.      Do you know if that is the opt out

3     language that was used by all customers who

4     chose to use language that was provided by

5     PROFAX between 2007 and 2011?

6          A.      No.

7                  MS. BARNES:  That's all I have.

8                  MR. BELLIN:  I am sorry.

9     EXAMINATION (CONT'D)

10    BY MR. BELLIN:

11         Q.      When you say that no, do you know

12    whether -- do you have knowledge as to

13    whether -- either way as to whether this

14    language was used by Balboa?

15         A.      Can you be more specific?

16         Q.      Do you have any knowledge as to

17    what language Balboa -- withdrawn.

18                 Do you have any knowledge as to

19    what opt out language was on Balboa's faxes

20    sent to your company from 2007 to 2011?

21         A.      Only what you gave me as Exhibit

22    5.

23         Q.      Other than that, do you have

24    knowledge of any other opt out notice ever used

25    by Balboa?

Page 120

2        A.      No.

3                MR. BELLIN:  That's all.

4                (Discussion off the record.)

5                MR. BELLIN:  We will get the

6        transcript to the witness, and he will

7        have until the 4th of September to make

8        any revisions.

9                THE WITNESS:  I do have a question

10       on the record.  Can someone advise me in

11       terms of changes I am allowed to make or

12       not make?

13               MR. BELLIN:  You have to consult

14       with an attorney about that.

15               MS. BARNES:  You want to make it

16       clear on the record, Andrew, that you are

17       not waiving your right to review and

18       revise what has been said.

19               THE WITNESS:  That's correct.

20               MS. BARNES:  Thank you.  Have a

21       nice weekend, all.

22               (Time noted:  12:47 p.m.)

23

24

25

Page 123

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK          )
                                )  Ss. :
5    COUNTY OF NEW YORK         )

6

7            I, STEPHEN SOHMER, a reporter

8    and Notary Public within and for the State of

9    New York, do hereby certify:

10           That ANDREW BARNETT, the witness whose

11   deposition is hereinbefore set forth,

12   was duly sworn by me and that such deposition

13   is a true record of the testimony given by

14   such witness.

15           I further certify that I am not

16   related to any of the parties to this action

17   by blood or marriage, and that I am in no way

18   interested in the outcome of this matter.

19           IN WITNESS WHEREOF, I have hereunto

20   set my hand on this 22nd day of August, 2012.

21

22

23   _____
         STEPHEN SOHMER

24

25